UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Chubb Custom Ins. Co.,                                    Civil No. 07-3132 (JRT/FLN)

    Plaintiff,

v.                                                       **REPORT AND**
                                                         **RECOMMENDATION**
Venmar CES, Inc.

    Defendant and
    Third-Party Plaintiff,

    v.

Von Weise USA, Inc.,

    Third-Party Defendant.

_____

William LeMire for Third-Party Plaintiff.
Hal Shillingstad for Third-Party Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on September 18, 2008, on Third-Party Defendant's Motion for Summary Judgment [#29]. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends Third-Party Defendant's Motion be **DENIED**.

**I.     FINDINGS OF FACT**

This case originated with a suit by Chubb Custom Insurance Company, the insurer and subrogee for a Real Estate Equities Inc.-owned apartment building in St. Paul, Minnesota. (Chubb Compl. ¶¶ 1-2.) The Real Estate Equities building included a commercial heat recovery ventilator (HRV) manufactured by Defendant Venmar CES, Inc. (Chubb Compl. ¶¶ 5-6.) Venmar CES, Inc.

("Venmar") manufactures HRVs for commercial use, and its sister company, Venmar Ventilation Inc., manufactures residential HRVs. (Fecteau Aff. ¶¶ 2-3, 18.) The apartment building's HRV caught fire in November 2005, causing extensive damage. (Chubb Compl. ¶ 6.) In September 2007, Venmar brought a third-party complaint against motor manufacturer Von Weise USA, Inc., formerly known as "Fasco,"[1] and subsequently settled with Chubb Custom Insurance. (Dkt. No. 15.) The case is before the Court on Third-Party Defendant Fasco's Motion for Summary Judgment. (Dkt. No. 29.)

Venmar's claim against Fasco is for contribution based on Fasco's alleged negligent failure to warn of the alleged danger presented by the Fasco motor used in Venmar's HRV product. *(See generally* Venmar Third-Party Compl.; Venmar Mem. Opp. 1-2.) Venmar claims Fasco knowingly provided Venmar with a dangerous motor. (Venmar Mem. Opp. 2.) The motor was dangerous, Venmar argues, because it included a cycling thermal protector instead of a one-shot thermal protector. (Venmar Mem. Opp. 10-11.) Thermal protectors regulate electrical current and shut down the motor when it gets too hot. (LeMire Aff. at Ex. K.) A cycling thermal protector, after shutting down an overheated motor, allows the motor to turn back on when it cools down. (Juneau Dep. 54:15 - 56:1, Jan. 7, 2008) A one-shot protector, in contrast, permanently shuts down the overheated motor, which must then be replaced. (Juneau Dep., 62:8-18.) Venmar claims Fasco had a duty to recommend a safer one-shot thermal protector instead of a cycling protector because Fasco knew a cycling protector could eventually fail to turn off an overheated motor and allow a fire to start. (Venmar Mem. Opp. 28-32.)

Fasco claims it had no duty to warn Venmar, and further claims that the actual cause of the

---

[1] In their court filings, the parties have consistently referred to Von Weise USA, Inc. f/k/a Fasco Industries, Inc. as "Fasco." For purposes of clarity, the Court will adopt this terminology and refer to the Third-Party Defendant as "Fasco" throughout this Report and Recommendation.

apartment fire was another part of the HRV called the capacitor, not the Fasco motor's cycling thermal protector. (Fasco Mem. Supp. 11-12; Statement of Expert Opinions of Maurice Goldin 7, Jun. 23, 2008.) A capacitor is a device that sits on top of the motor to help it run more efficiently. (Expert Rep. of Martin Hudis 11; Fasco Mem. Supp. 6 at Fig. 3,4.) Some capacitors have thermal protection devices that shut down the capacitor when the pressure and temperature inside the capacitor get too high, but some capacitors do not have this protection. (Juneau Dep. 52:1-25.) Venmar originally ordered motors from Fasco that included thermal-protected capacitors. (Juneau Dep. 50:15-52:21.) A few years later, Venmar began ordering motors from Fasco without capacitors so that Venmar could purchase different capacitors from an alternate manufacturer. *Id.* These new capacitors, called Cambridge capacitors, did not have thermal protection. *Id.*

**1. The Relationship Between Venmar and Fasco**

Venmar and Fasco have had a business relationship since the early 1980s, when Venmar engineers began designing HRVs. (Goldin Dep. 21:3, Jan. 29, 2008.) However, Venmar and Fasco disagree about the precise nature of the relationship. Venmar describes the relationship as close and collaborative, involving numerous visits, personal meetings, calls, correspondence, etc., and provided evidence that Fasco was involved in the HRV design process. (Forest Aff. ¶¶5-8, 13-15, Exs. A-J; To Aff. ¶¶5-16; Fecteau Aff. ¶¶ 4, 14, 15; Janelle Aff. ¶¶ 10,11.) Venmar argues it had very little motor expertise and relied on Fasco as the motor expert responsible for designing optimized custom motors for Venmar's HRVs. (Juneau Dep. 100:7-18; Daniel Forest Aff. ¶11.)

In contrast, Fasco describes its relationship with Venmar as a detached supplier-purchaser relationship in which Fasco supplied a multi-use component part for use in an integrated final product. (Manley Dep., 21:21 - 25:18, Apr. 10, 2008.) Fasco argues that Venmar provided detailed

specifications for the motors and Fasco simply built the motors to Venmar's specifications. (McNeill Aff. ¶7.) Fasco also disputes Venmar's characterization of Fasco as a participant in the design process, and argues that Venmar did not consult with Fasco on any of the HRV design details. (McNeill Aff. ¶7.)

### 2. Fasco's Contract Indemnification Defense

Fasco argues that the list of 16 terms entitled "General Terms and Conditions of Sale" located on the back of Fasco customer acknowledgment form became part of the contract between Venmar and Fasco. (Forest Aff., Ex. L.) The General Terms include a provision for full indemnification by the purchaser (in this case, Venmar) for any claims relating to the motor application, including Fasco's own negligence or other fault. *Id.* Thus, Fasco argues, Venmar's contribution claim is barred by the terms of the contract. (Fasco Mem. Supp. 13-14.) In response, Venmar argues the General Terms never became part of the contract because Venmar never expressly accepted the terms. (Venmar Mem. Opp. 40, Forest Aff. Ex. L.)

Throughout their long relationship, Venmar and Fasco appear to have consistently carried out motor transactions in the same manner. (Sobush Aff. ¶¶ 3-9.) Venmar issued a purchase order to Fasco containing the model number, price, and quantity of electric motors they wished to purchase. *Id.* Fasco routinely sent a responsive acknowledgment document confirming receipt and stating the release date for shipping the motors. *Id.* The General Terms were on the back of the acknowledgment form. *Id.* at Ex. 2. A provision near the bottom of the front page of Fasco's acknowledgment form, which evokes the terms of Uniform Commercial Code § 2-207(1) and Minn. Stat. §336.2-207(1), states that the order is "accepted conditionally upon your [Venmar's] acceptance of the terms and conditions of sale." *Id.* After sending the acknowledgment form, Fasco

would release the motors for shipping and the motors would be shipped at Venmar's expense to their Quebec facility. (Sobush Aff. ¶ 9.) Shortly after delivery, Fasco would send an invoice requesting payment and Venmar would respond by sending Fasco a check. *Id.*

Venmar claims that it never accepted Fasco's terms because express acceptance was required by the provision on the front of the acknowledgment form, and Venmar never accepted the additional terms. (Venmar Mem. Opp. 36.) Fasco presents no evidence to rebut Venmar's claim of non-acceptance, arguing instead that the evidence Venmar presented with respect to acceptance (*e.g.*, employee affidavits and recent examples of a purchase order and customer acknowledgment form) is not legally relevant. (Fasco Reply Mem. 14.)

## II.   STANDARD OF REVIEW

According to Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to determine whether a certain fact is material, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The inquiry performed is the threshold inquiry of determining whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

When determining whether to grant a motion for summary judgment, a court must view all

of the facts in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). When the moving party brings forth a proper summary judgment motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e); *see Anderson*, 477 U.S. at 256. ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c).")

**III. LEGAL ANALYSIS**

**A. Third-Party Defendant Fasco's Motion for Summary Judgment on Venmar's Negligent Failure to Warn Claim Must Be Denied [#29].**

**1. Fasco's Defense Under the Component Part Supplier Doctrine Does Not Entitle It To Summary Judgment Because a Genuine Issue of Material Fact Exists as to Whether Fasco Substantially Participated in the HRV Design.**

Fasco claims it is entitled to summary judgment on Venmar's negligent failure to warn claim because it was a component part supplier and because it did not substantially participate in the design of Venmar's HRV. [2] Under Minnesota law, negligent failure to warn claims against

---

[2]Under the component part supplier doctrine, a manufacturer of a non-defective component part is not liable for injuries caused by the finished product when the parts are integrated into a larger system that the component part supplier did not design or build. *Sperry v. Bauermeister, Inc.*, 4 F.3d 596, 598 (8th Cir. 1993)(manufacturer of rotary airlock integrated into spice milling system not liable under component parts doctrine) (applying Missouri law); *In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation,* 97 F.3d 1050, 1056

6

suppliers of parts deemed to be non-defective or inherently safe "component parts" are precluded by the component part supplier doctrine absent substantial participation in the design of the final product by the component part supplier. *In re TMJ Implants*, 97 F.3d at 1058 (applying Minnesota law) (citing *Crossfield v. Quality Control Equipment Co.,* 1 F.3d 701, 706 (8th Cir. 1993) (applying Missouri law)). In applying the component parts doctrine to shield the component part manufacturer from liability for damage caused by the final product, the Court in *In re TMJ Implants* placed particular emphasis on the fact that the component part supplier had no role in designing or building the finished product. *In re TMJ Implants*, 97 F.3d at 1058; *see also Crossfield*, 1 F. 3d at 705; *see also Buonanno v. Colmar Belting Co., Inc.*, 733 A.2d 712, 719 (R.I. 1999) ("We hold that this case stands for the proposition that the primary duty is owed by the designer of the assembled machine and not the supplier of the component parts *in the absence of substantial participation* in the integration of the component into the design of the product." (emphasis added)). Thus, a "substantial participation" exception to the component parts doctrine exists where the component part supplier substantially participates in the design of the final integrated product. *See In re TMJ Implants*, 97 F.3d at 1058; *see also* Restatement (Third) of Torts: Products Liability §5(b)(1) cmt. e (noting that "substantial participation" can take various forms, including playing a substantial role in deciding which component best serves the requirements of the final integrated product or designing a component that will perform specifically as part of the integrated component).

      Fasco argues it is not liable for negligent failure to warn because the motor it provided

---

(8th Cir. 1996)(manufacturer of Teflon-type film component used in a temporomandibular joint implant not liable under component parts doctrine)(applying Minnesota law).

Venmar is a component part within the meaning of the component part supplier doctrine and because Fasco did not substantially participate in the HRV design.  Assuming without deciding that the motor is indeed a component part, summary judgment is not appropriate here because a genuine issue of material fact exists with respect to whether Fasco substantially participated in the design of Venmar's HRV.  Venmar presented specific pieces of evidence as to Fasco's participation in the HRV design that, taken in the light most favorable to Venmar, could lead a reasonable jury to return a verdict for Venmar on the element of substantial participation.

For example, Venmar submitted the affidavit of Ky Xuan To, a Venmar physicist who worked at Venmar Ventilation, Inc. from 1980 to 1987, who stated that Venmar "repeatedly consulted with Fasco representatives during the period in which we developed Venmar Ventilation's first HRVs." (To Aff. ¶¶ 1, 5.)  Motors are the heart of residential and commercial HRV design, and Venmar accepted Fasco's choices regarding the motor and its related parts and configured the rest of the HRV around the motor. (To Aff. ¶¶ 13-15; Forest Aff. ¶ 20-22; Fecteau Aff. ¶ 14.)  To stated that Fasco "completely designed the blower [a motor with a fan and a thermal protector included]," which is "the most important part of the HRV," and that Fasco's recommendation about which blower to use "affected how we configured the HRV's shape and size." (To Aff. ¶¶ 4, 13-15.)

Venmar presented evidence that Fasco knew Venmar HRVs exchanged heat, ran continuously 24/7/365, were installed in remote areas of the building, and that Venmar accepted Fasco's informed recommendations about motor specifications because Fasco held itself out as a motor expert and Venmar is not a motor expert. (Fecteau Aff. at ¶ 16; Forest Aff. ¶¶ 9-11, 13-14; Wawryk Aff. ¶¶ 12-13.)  According to Venmar lab engineer and research and development

project manager Luc Janelle, who worked at Venmar from 1987 to 1994, Fasco was "very involved with both Venmar Ventilation and Venmar CES" during his employment. (Janelle Aff. ¶¶ 2-3, 10; *see also* Forest Aff. ¶¶13-19; *see also* Wawryk Aff. ¶ 14.)  Janelle stated, "Given the importance of the motor to our HRVs, it is accurate to say Fasco was a business partner rather than a mere parts supplier."  (Janelle Aff. ¶ 10; *see also* Olmstead Aff. ¶¶ 12-18.)  Janelle stated that Venmar and Fasco representatives visited each other's facilities, and described a meeting in the late 1980s in which Janelle described a problem with a Fasco HRV motor and, in response, Fasco decided to change the configuration of the internal motor windings.  (Janelle Aff. ¶ 11.)

Additionally, Venmar submitted letters, faxes, and drawings exchanged between Venmar and Fasco regarding motor and HRV design that could, together with the evidence discussed above, lead a reasonable jury to find that Fasco substantially participated in the design of Venmar's HRVs.  (Forest Aff. ¶15, Exs. A-J.)  Thus, a genuine issue remains and Fasco's summary judgment motion must be denied.

**2. Fasco's Contract Indemnification Defense Does Not Entitle It To Summary Judgment Because a Genuine Issue of Material Fact Exists as to Whether Fasco's General Terms and Conditions Became Part of the Contract Between Fasco and Venmar.**

Fasco argues that it is not liable in contribution for negligent failure to warn because the contract between the parties indemnified Fasco.  Fasco claims that a group of 16 provisions located on the back of its customer acknowledgment form (Fasco's "General Terms and Conditions") are a part of its contract with Venmar.  (Forest Aff. at Ex. L.) Based on Term #11, a sweeping indemnification clause, Fasco argues Venmar's contribution claim must be barred under the terms of the contract. *Id.*

9

**A. Legal Background**

Under well-settled contract principles, contract formation requires an offer, an acceptance, and valuable consideration. *See Taxi Connection v. Dakota, Minnesota & Eastern R.R. Corp.*, 513 F.3d 823, 826 (8th Cir. 2008) (citing *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn.Ct.App.2006)). In a diversity case, such as the instant case, the court must apply the law of the forum state. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Roma Tool & Plastics, Inc., v. Battenfeld of America, Inc.*, 705 F.Supp. 1380, 1384-85 (D. Minn. 1989). When the contract is for the sale of goods, Article 2 of the Uniform Commercial Code applies. *See* Minn. Stat. § 336.2-105.[3] "Goods" are defined as all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale. Minn. Stat. § 336.2-105(1).

Article 2 also provides for situations in which a contract has been formed by performance (where the goods have been shipped and paid for) but where the writings of the parties disagree – a "battle of the forms" situation. Minn. Stat. § 336.2-207(3); *see also PCS Nitrogen Fertilizer, L.P., v. Christy Refractories, L.L.C.*, 225 F.3d 974, 980-82 (8th Cir. 2000). In such situations, a contract has undeniably been formed; the only questions remaining are with respect to the content of the contract. *Id.* To determine the content, we look to Minn. Stat.§ 336.2-207(1), which states, "A definite and seasonable expression of acceptance or a written confirmation

---

[3] If Fasco's General Terms and Conditions are determined to be part of the contract, it is possible that Missouri law will govern according to the choice of law provision listed as Term 13. (Forest Aff. Ex. L.) However the initial question of whether the General Terms and Conditions are part of the contract is governed by the contract formation principles of UCC § 2-207, codifed at Minn. Stat. § 336.207. *Roma Tool & Plastics, Inc., v. Battenfeld of America, Inc.*, 705 F.Supp. 1380, 1384 (D. Minn. 1989). Further, as Missouri has also adopted UCC § 2-207, codified at Mo. Rev. Stat § 400.2-207, the analysis is identical under both states' law.

which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, *unless acceptance is expressly made conditional on assent to the additional or different terms*. (emphasis added)." Thus, if an offeree's acceptance is expressly conditioned on the offeror's acceptance of additional terms, the offeree's purported acceptance does not operate as a valid acceptance unless the additional terms are expressly accepted by the offeror. See *PCS Nitrogen*, 225 F.3d at 978-80. If the additional terms are not expressly accepted by the offeror, the acceptance is invalid and no contract is formed. *Id.* Of course, a contract may be formed later by performance on both sides. Minn. Stat. § 336.2-207(3).

### B. The Battle of the Forms

The Venmar-Fasco situation presents the classic "battle of the forms" situation envisioned by UCC § 2-207 and Minn. Stat. § 336.2-207. Venmar's purchase order includes terms like part number, order quantity, unit price, extended price, and freight terms. (Sobush Aff. at Ex. 1.) Fasco's customer acknowledgment form mirrors those terms, but presents additional terms in the form of its "General Terms and Conditions." (Sobush Aff. at Ex. 2.) Additionally, Fasco's customer acknowledgment includes a provision on the bottom front of the document that states, "Your order is accepted conditionally upon your acceptance of the terms and conditions of sale appearing above and on the reverse side of this form," closely following Minn. Stat. 336.2-207(1). *Id.*; Minn. Stat. 336.2-207(1) ( "...unless acceptance is expressly made conditional on assent to the additional or different terms."). The Court finds that this Fasco provision places this situation within the confines of Minn. Stat. § 336.2-207(1), and that therefore the question presented for purposes of summary judgment is whether or not Venmar

11

expressly accepted the General Terms and Conditions. If Venmar did expressly accept the General Terms, Fasco's customer acknowledgment form would have operated as a valid acceptance, causing formation of a contract that included the General Terms and Conditions indemnification provision. Fasco presented no evidence as to Venmar's acceptance. Venmar presented testimony tending to show that it never accepted the General Terms and Conditions.

Venmar submits a Venmar purchase order, dated October 1, 2002, and a Fasco customer acknowledgment form, dated October 3, 2002. (Sobush Aff. at Exs. 1, 2.) Venmar claims that it does not have many records from the 1980s and 1990s concerning Fasco, but represents that these 2002 documents are fair and accurate representations of the purchase orders and customer acknowledgment forms from that time period. (Sobush Aff. ¶¶ 6,8; Haubrich Aff.¶ 4.) In support of this claim, Venmar presented testimony from employees who worked at Venmar during time periods spanning from 1977 until the present time, and were familiar with the documents and the typical Venmar-Fasco purchasing arrangement. *Id.* Further, Venmar presents testimony that Venmar never assented to the Fasco General Terms and Conditions, that Venmar never would have assented to the terms because they are one-sided, and that the General Terms were never relied upon by Fasco during the course of its business with Venmar. (Sobush Aff. ¶¶ 10-11; Fecteau Aff. ¶ 11; Bourbeau Aff. ¶¶ 5-11; Audet Aff. ¶¶ 3, 5; Forest Aff. ¶¶ 31-32.) Further testimony argues that the only time Venmar ever discussed the General Terms and Conditions with Fasco, a Fasco representative told Venmar that the terms did not apply to special, direct-purchaser, large-volume customers like Venmar. (Audet Aff. ¶ 4.)

Based on the record, the Court finds that Venmar has presented sufficient evidence to lead a reasonable jury to find for Venmar on the issue of whether the General Terms and

Conditions became part of the contract, and thus a genuine issue of material fact remains that precludes summary judgment on Fasco's contract indemnification claim.

Fasco repeatedly argues that Venmar's evidence showing lack of acceptance is not legally relevant and therefore cannot be considered for purposes of summary judgment. (See Fasco Reply Mem. 14.) Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Fed. R. Ev. 401.  The standard of probability under the rule is "more probable than it would be without the evidence," and the trial judge has broad discretion to determine whether an item of evidence is relevant.  Fed. R. Ev. 401, comment; *Hamling v. United States*, 418 U.S. 87, 124-25 (1974); *see also* Weinstein's Federal Evidence § 401.3.  The Court finds that the evidence presented by Venmar clearly meets the liberal relevancy standard, as it directly pertains to the formation of the contract between Venmar and Fasco.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Third Party Defendant's Motion for Summary Judgment [#29] be **DENIED**.

DATED: October 24, 2008              s/ *Franklin L. Noel*
                                                      FRANKLIN L. NOEL
                                                      United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **November 13, 2008**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's

brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **November 13, 2008,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.